Gen. 75]                                                                 75

## CONSTITUTIONAL LAW

FREEDOM OF SPEECH — EFFECT OF *FORSYTH COUNTY V. NATIONALIST MOVEMENT,* 112 S.CT. 2395 (1992), ON STATE AND LOCAL REGULATION OF PARADES, DEMONSTRATIONS, AND PUBLIC MEETINGS

January 11, 1993

*The Honorable Samuel I. Rosenberg*
*House of Delegates*

You have asked for our opinion concerning the effect of *Forsyth County v. Nationalist Movement*, 112 S.Ct. 2395 (1992), on existing statutes, ordinances, and regulations of the State and local subdivisions. We have examined a number of State and local policies concerning parades, demonstrations, and public meetings and have identified some that raise constitutional issues of the type raised in *Forsyth*. In general, we can identify a number of constitutional defects in the present formulation of these policies.[1]

## I

## Prior Supreme Court Precedents

It has long been established that a government may validly impose a permit requirement for parades and demonstrations. *Cox*

---

[1] In our review of local ordinances we concentrated on policies that raise problems under *Forsyth,* as distinct from other types of issues under previously established constitutional requirements. Because of this, and because we have not examined every possible policy, our failure to mention a specific law, ordinance, or regulation should not be interpreted to mean that we have determined that it is constitutional. For example, the Elkton Parade Ordinance, §99-4 of the Elkton Code, does not raise *Forsyth* problems but has been found to give overly broad discretion to local officials. *Invisible Empire, Knights of the Ku Klux Klan v. Town of Elkton,* Civil No. L-92-724 (D. Md. Sept. 3, 1992). In addition, some local subdivisions have unwritten policies. *See Invisible Empire KKK v. Mayor of Thurmont*, 700 F. Supp. 281 (D. Md. 1988). Unwritten policies are, almost by definition, unconstitutional. *ACORN v. City of Tulsa*, 835 F.2d 735 (10th Cir. 1987).

*v. State of New Hampshire*, 312 U.S. 569 (1941). However, standards must be provided for the grant or denial of a permit so that the decision is not left in the unfettered discretion of the administrator.

In *Cox v. New Hampshire*, the Supreme Court approved an ordinance providing that a permit was to be granted unless convenience of use of public streets would be unduly disturbed. In other cases, the Supreme Court has rejected laws that set no standards at all. *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750 (1988); *Cox v. State of Louisiana*, 379 U.S. 536 (1965). The Court has also rejected laws with standards so loose or vague as to leave room for content-based discrimination. *Hague v. Committee for Industrial Organization*, 307 U.S. 496 (1939) (permit to be denied if, in the view of the administrator, denial would prevent "riots, disturbances, or disorderly assembly"); *Shuttlesworth v. City of Birmingham*, 394 U.S. 935 (1969) (denial allowed for reasons of "public welfare, peace, safety, health, decency, good order, morals or convenience"). In addition, prompt review of denials must be available. *Lakewood v. Plain Dealer Pub. Co.*; *National Socialist Party of America v. Skokie*, 432 U.S. 43 (1977); *Southeastern Promotion, Ltd. v. Conrad*, 420 U.S. 546 (1975). Finally, in *Cox v. State of New Hampshire*, the Court upheld a permit fee that ranged between nominal and $300, based upon the size of the parade.

## II

### *Forsyth*

In the *Forsyth* case, the Supreme Court considered the validity of a parade ordinance that provided for a permit fee of up to $1,000 as set "from time to time" by a county board of commissioners.[2] In practice, the fee was set on a case-by-case basis and varied widely. No evidence was produced to show that the difference in cost was

---

[2] The legislative history of the ordinance reflected the view of the board of commissioners that "the cost of necessary and reasonable protection of persons participating in or observing said parades, assemblies, demonstrations, road closings, and other related activities exceeds the usual and normal cost of law enforcement for which those participating should be held accountable and responsible."

related to the expense of processing the application. In addition, the decision whether to charge for police protection, and how much, was left to the discretion of an administrator.

The Court found that this standardless authority to set fees was invalid:

> The decision how much to charge for police protection or administrative time − or even whether to charge at all − is left to the whim of the administrator. There are no articulated standards either in the ordinance or in the county's established practice. The administrator is not required to rely on any objective factors. He need not provide any explanation for his decision, and that decision is unreviewable. Nothing in the law or its application prevents the official from encouraging some views and discouraging others through the arbitrary application of fees. The First Amendment prohibits the vesting of such unbridled discretion in the government official.

112 S.Ct. at 2403.

The Court went on to find that the ordinance was also invalid because the assessment of the fee involved content-based considerations − specifically, gauging public response to the proposed speech and the number of police necessary to meet that response. Under this system, "[t]hose wishing to express views unpopular with bottle-throwers, for example, may have to pay more for their permit." *Id*. The Court concluded that "[s]peech cannot be financially burdened, any more than it can be punished or banned, simply because it might offend a hostile mob." 112 S.Ct. at 2404. Finally, the Court found that the $1,000 cap did not save the ordinance, because "[a] tax based on the content of speech does not become more constitutional because it is a small tax." 112 S.Ct. at 2405.

## III

### State Policies

#### *A.     The University of Maryland*

In your opinion request, you specifically asked about assessment of fees to student groups at the College Park campus of the University of Maryland for costs associated with sponsoring controversial speakers.  This practice became an issue a few years ago when Louis Farrakhan was invited to speak by the Black Student Union.

In that case the controversy arose when campus police sought to require the Black Student Union to pay the costs for the extra security perceived to be needed for the event.  A resolution was apparently reached in which the Union paid some of the costs out of monies left over from ticket receipts after other expenses were paid.  Subsequently, the issue was referred to the President's Select Committee on Freedom of Expression.  In a report dated November 13, 1989, the Committee recommended, in part:

> (1) The campus police should develop criteria to be used in determining the level of security for all events held on campus.

> (2) The campus police should develop expected levels of security for various locations and types of events.  These levels would be applied to all routine campus events.  For extraordinary events the campus police should establish a process for the development of security needs.  The process should allow for appropriate student involvement and for an appeal process.
>
>                                  . . .

> (5) The athletic department, Student Entertainment Enterprises (SEE), Summer School, for-profit student sponsored entertainment events, and outside groups using campus facilities should continue to pay for security.

(6) The budget for the campus police should be enhanced by the SGA [Student Government Association] and by special campus allocations to cover all security costs except those specified in 5 above. This enhancement should be based on the average of the costs of the preceding three years. With this enhancement the campus police would be expected to provide security for all appropriate events without charge.

In response to suggestions 1 and 2, the Committee to Assess Security Needs of Student Events issued guidelines concerning security requirements. The report of this committee, issued May 17, 1991, sets minimum security requirements for a variety of campus locations and listed additional factors that could alter that requirement. The additional factors are: advertising; whether the event is open to the general campus population and the public or is limited to members of the sponsoring organization; expected crowd size; amount of staffing provided by the sponsoring organization; history of the sponsoring organization and of any similar events; whether money will be collected; the type of crowd expected; increased risks arising from threats, planned demonstrations, and similar factors; and the need to conduct searches. It is our understanding that these factors are in fact used by campus police in determining security requirements.

Due to budget constraints, suggestion 6 has not been implemented. Instead, a special fund has been created for "extraordinary security costs related to events featuring controversial speakers." This fund consists of money from the College Park administration and SGA and is available to cover extraordinary security costs of SGA-recognized student groups or other registered student groups that co-sponsor events with SGA-recognized groups or through SEE. Basic security costs must be covered by the group. Groups are encouraged to sell tickets or increase ticket prices to cover the costs and income from ticket sales "must as a first priority be used to repay the amount spent from the fund." A group may not deplete the fund by more than $1,000 annually. Finally, the fund agreement provides that "[t]he President of SGA and the Vice President for Student Affairs will jointly administer the fund. Where

agreement is not reached, the event in question will not be eligible to receive funds from this account."

As we understand it, basic expenses are those determined with reference to such neutral factors as venue, expected crowd size, and event type, while extraordinary expenses are those based on content-related factors, such as public reaction and group and event history. Because basic expenses are based on neutral factors and are calculated based on set guidelines, it is our view that they may appropriately be charged to sponsoring organizations without constitutional violation. Extraordinary expenses, however, present a different situation.

Since extraordinary expenses are based on factors such as public response, they cannot, under *Forsyth*, be charged to the sponsoring groups. With respect to student groups, an attempt has been made to avoid this problem by creation of the fund. However, as the fund is currently set up, a group that wished to have a series of controversial speakers would have to pay its own extraordinary costs or pass the charges on to those who wish to hear controversial speakers in order to avoid the $1,000 depletion limit. Thus, sponsors or participants could have to pay extra based on the perception of campus police that certain speech was likely to engender hostile reactions. That is exactly the problem found invalid in *Forsyth*. Therefore, it is our view that the fund agreement does not save this aspect of the campus funding policy from unconstitutionality.

In addition, no limitation is placed on a decision by the President of SGA or the Vice President for Student Affairs to determine not to pay funds for a specific event. Thus, this portion of the agreement also presents a danger of content-based discrimination.

To the extent that the University makes venues available for use by the general public, it has created a public forum in which it cannot discriminate on the basis of content without the most compelling of reasons. *Perry Education Association v. Perry Local Educators' Association*, 460 U.S. 37, 45-6 (1983). Funding the police is not such a compelling reason. *Forsyth*, 112 S.Ct. at 2404. Therefore, charging extraordinary security costs to outside sponsors also raises serious constitutional problems under the ruling in *Forsyth*.

### B.    *Department of Natural Resources*

The Department of Natural Resources has jurisdiction over forests and parks in the State.  The regulations of the Department provide that "[i]n all State forests, except under permit obtained in advance from a forest officer, public meetings, exhibitions, and demonstrations of any kind are prohibited."  COMAR 08.07.01.11.  This regulation provides no standards for the issuance or denial of a permit.  Without such standards, the regulation is of doubtful validity.  *ACORN v. City of Tulsa, Okla*., 835 F.2d 735 (10th Cir. 1987).  At the very least, the regulation should be administered by promptly granting all requests without charge until a constitutional regulation can be promulgated.[3]

### C.    *Department of General Services*

The Department of General Services has general control of State office buildings and the property around them.  The Department has not formally adopted regulations concerning demonstrations or other First Amendment activity on property under its control.  The Department does have certain "rules and regulations" that it posts in buildings under its control.  Without adoption under the Administrative Procedure Act, however, these regulations do not have the force of law.[4]

The regulations bar disorderly conduct on State property as well as conduct that obstructs entrances and passageways.  The regulation further requires prior approval for the distribution of pamphlets and handbills.  In addition, the Department has an informal permit system for demonstrations.  Under this system, permits are issued without charge to anyone who requests them unless the demonstration would conflict with a previously scheduled event.

---

[3] It is our understanding that the Department is currently working on revised regulations.

[4] Because the regulations have "significant direct effects on the public," they are not within the "internal management" exception to rulemaking requirements. 75 *Opinions of the Attorney General* 37 (1990); 72 *Opinions of the Attorney General* 230 (1987).  We understand that the Department is considering adopting the regulations.

It is our view that enforcement of these policies, in the absence of adoption under the Administrative Procedure Act, raises significant constitutional concerns about excess administrative discretion. We strongly encourage the Department to move forward with the adoption of regulations.

# IV

## Local Subdivisions

### A.  *Consideration of Police Protection Requirements*

Section §24-369(2) of the Baltimore County Code, §15-29(4) of the Greenbelt Code, and §123-4B of the Chestertown Code each allow denial of a permit upon a determination that conduct of the parade or meeting will require the diversion of so great a number of adjacent areas as to prevent normal police protection in other areas of the county or city.[5] These provisions would allow an administrator to deny a permit to a group with unpopular views solely on the ground that protecting the group from others would require too many police officers.

It is our view that, just as the need for police protection due to anticipated bystander reaction cannot serve as a ground to make speech more expensive, it also cannot serve as a ground to ban it altogether. Therefore, it is our view that these provisions are invalid.[6]

---

[5] The Baltimore County and Chestertown ordinances refer to parades; the Greenbelt ordinance refers to meetings.

[6] Section 146-4 of the College Park Code, and certain other jurisdictions also allow denial of a permit if the concentration of persons will be such as to interfere with proper fire and police protection and ambulance service to nearby areas. As we read those provisions, their purpose is to address traffic flow and not to permit consideration of crowd control requirements. In fact, the two provisions frequently appear together. *See* §24-369(4) of the Baltimore County Code; §14-24(6) of the Greenbelt Code, §14-24(6); §123-4D of the Chestertown Code. To the extent that such provisions are, in fact, aimed only at traffic flow, they would be valid.

### B.    Fee Waivers

Section 59-1D of the Perryville Code sets a permit fee of $500 but provides that the Commissioners may waive the fee "at their discretion."  Section 123-3D of the Chestertown Code sets a permit fee of $5 but provides that the Mayor and Council have "the right to waive any fee."  Neither ordinance provides any standards to be applied in determining whether a fee should be waived.

In the absence of such standards, local officials are left with unfettered discretion to discriminate on the basis of viewpoint. Therefore, these provisions are unconstitutional.  Even though the Chestertown fee is only $5, the constitutional problem still exists. *See Forsyth*, 112 S.Ct. at 2405.[7]

### C.    Insurance and Bonding Requirements

College Park requires an applicant to obtain an approved surety indemnity bond or approved comprehensive liability insurance policy naming the City of College Park as an additional insured. The insurance or bond must cover all claims for personal injury and property damage" from all claims arising from the permit issued pursuant to this chapter."  Similarly, §109-11 of the Westminster Code requires an applicant to give bond to the City for all expenses related to the parade, including riotous and tumultuous assemblage of people and vandalism "attributable to the holding of such parade or demonstration."  In each case, the ordinance would appear to require coverage of damages caused by bystanders and hostile crowds as well as participants.

The ruling in *Forsyth* would prohibit application of a bonding or insurance requirement that applies to damages caused by hostile crowds.  In fact, some courts have held bonding and insurance requirements generally invalid, because the effect is to render

---

[7] We have found one provision where the fee is to be set by local officials, as it was in *Forsyth*.  §24-368(e) of the Baltimore County Code. However, we have been informed that the fee is set for all permits and not on a case-by-case basis.  It is our view that, as so applied, the provision is constitutional, so long as the county is able to show that the fee is in fact related to the administrative costs of their regulation.  *Murdock v. Commonwealth of Pennsylvania*, 319 U.S. 105 n.8 (1943).

speech, especially unpopular speech, more expensive or even to bar it altogether. For example, in *Invisible Empire KKK v. Mayor of Thurmont,* 700 F. Supp. 281 (D. Md. 1988), the court found that parade insurance was simply not available to the Ku Klux Klan. The court went on to find that the town had failed to show that the insurance requirement was necessary to any compelling governmental interest, given that the town's general liability insurance would cover any claims against the town and the town's interest could be more narrowly served by enforcing its laws against damage to persons and property. A similar conclusion was reached in *Eastern Conn. Citizens Action Group v. Powers*, 723 F.2d 1050 (2d Cir. 1983), where the court noted that insurance for such events was difficult and expensive to obtain even for a non-controversial, community-oriented group and that other steps could be taken to minimize the risk of liability. *See also Collin v. Smith*, 447 F. Supp. 676 (N.D. Ill.), *aff'd,* 578 F.2d 1197 (11th Cir. 1978).

Thus, it is our view that the College Park and Westminster insurance and bonding requirements are unconstitutional.

### D.    *Payment for Police Protection*

Section 12-153 of the Rockville Code provides that the city may require an applicant for a "public event license" to employ one or more special deputy sheriffs, licensed uniformed security officers, or other security personnel to keep order.[8] If this requirement is applied in a way that allows the city to consider the reactions of bystanders, it is indistinguishable from *Forsyth* and would be invalid.

In addition, at least one court has held that security costs may not be imposed on an applicant at all. *Invisible Empire Knights of KKK v. City of W. Haven,* 600 F. Supp. 1427 (D. Conn. 1985). Others have held that the imposition of security costs is invalid only if the amount is left to the discretion of local officials, thus permitting them to make content-based determinations. *Stonewall Union v. City of Columbus,* 931 F.2d 1130 (6th Cir. 1990), *cert. denied,* 112 S.Ct. 275 (1991); *Central Florida Nuclear Freeze Campaign v. Walsh*, 774 F.2d 1515 (11th Cir. 1985), *cert. denied*,

---

[8] A public event is one which interferes with the use by the general public of a street, sidewalk, or other public way in Rockville. §12-151.

475 U.S. 1120 (1986). As the Rockville ordinance sets no standards for when security is to be required, it would be unconstitutional under either standard.


# V

## Conclusion

In summary, it is our opinion that the State and local policies discussed in this opinion should be revised promptly to conform them to the requirements of the First Amendment discussed in *Forsyth County v. Nationalist Movement*.


J. Joseph Curran, Jr.
*Attorney General*

Kathryn M. Rowe
*Assistant Attorney General*

Jack Schwartz
*Chief Counsel*
  *Opinions & Advice*


*Editor's Note:*

Regulations of the Department of General Services on "demonstrations and rallies," adopted after isssuance of this opinion, may be found at COMAR 04.05.01.07. The regulation of the Department of Natural Resources discussed in Part IIIB above has been repealed.